NOTICE

Decision filed 07/19/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190169-U

NO. 5-19-0169

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Crawford County. |
| | ) | |
| v. | ) | No. 18-CF-25 |
| | ) | |
| ALFRED O. WALDROP, | ) | Honorable |
| | ) | Christopher L. Weber, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where the trial court did not hold a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), when the defendant clearly made a claim that his counsel was ineffective, we remand this case for the limited purpose of conducting a *Krankel* hearing.

¶ 2   The defendant appeals from his conviction and sentence for one count of predatory criminal sexual assault of a minor under the age of 13. Although charged with one specific crime that allegedly occurred on February 17, 2018, the State presented evidence that the defendant engaged in sexual intercourse on numerous unspecified dates from the time the victim was 6 years old until his arrest when she was 12 years of age. At the conclusion of the jury trial, the defendant was found guilty. The trial court sentenced the defendant to 25 years in the Illinois Department of Corrections to be followed by a 3-year term of mandatory supervised release.

1

¶ 3     On direct appeal the defendant raises three issues. First, he raises three claims of ineffective assistance of counsel: (a) that his attorney should have objected to the admissibility of victim's other-crimes statements and testimony introduced pursuant to section 115.73 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2016)) because the resulting prejudice outweighed any probative value and because the State did not introduce the other-crimes evidence in the form of specific instances, reputation evidence, or expert testimony; (b) that his attorney should have objected to the lack of a section 115-10 hearing (*id.* § 115-10) because there was no ability to determine the reliability of the victim's statements and to object to statements the victim made while investigators were in her home that were not included in the State's motion for section 115-10 approval; and (c) that his attorney should have objected to the State's mistaken recollection of an expert witness's testimony during rebuttal argument. Second, the defendant claims that he was deprived of a fair and impartial jury. Finally, the defendant claims that the court failed to conduct a *Krankel* hearing after he claimed that his attorney failed to include exculpatory medical evidence in his defense. For the reasons stated in this order, we remand this case to the trial court with directions to conduct a hearing on the defendant's claims of ineffective assistance of pretrial counsel.

¶ 4                                    I. BACKGROUND

¶ 5     The State charged the defendant with predatory criminal sexual assault of a child in violation of section 11-1.40(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(a)(1) (West 2016)). The State alleged that the defendant committed one act of vaginal penetration and that this act allegedly occurred on February 17, 2018. The victim was under the age of 13 and is the defendant's nonbiological granddaughter. The sexual abuse purportedly occurred weekly in various places within the home where the victim and the defendant resided. The victim's half-

2

brother and her biological grandmother also lived in this home. The victim informed authorities that the defendant would conceal the vaginal penetration by covering it with his flannel jackets so that it would appear that she was sitting on his lap. Illinois State Police Lab analysts determined that semen stains from one of the flannel jackets provided positive DNA identification linked to the defendant. Furthermore, the victim's DNA could not be excluded from a second profile from the same jacket.

¶ 6    On November 28, 2018, the State filed its motion to admit out-of-court hearsay statements made by the victim to Angela Newlin of the Healing Harbor Child Advocacy Center, to Julie Dickerson a middle school counselor, and to two other minors, K.C. and A.L. The advocacy center interview was recorded, while the other statements were in writing. The State indicated that a copy of the recording and statements had been provided to the defendant. On December 3, 2018, the State's motion was presented to the trial court. The defendant's attorney objected to the admission of these out-of-court statements based on hearsay. The trial court took the matter under advisement to review the proffered exhibits. The court did not hold an in-court hearing, but with the agreement of the parties, the court conducted an *in camera* review of the recording and statements. On December 5, 2018, the court entered its written order granting the State's motion.

¶ 7    Thereafter, on January 30, 2019, the State filed a motion *in limine* seeking to introduce evidence that the defendant had sexually abused the victim on earlier dates according to the victim's recorded statement and summaries of her written statements. In response, the defendant's attorney objected to introduction of this evidence because the State had not previously disclosed the other-crimes evidence. The State informed the court that the defendant's attorney had been provided with copies of R.M.'s prior statements, and stated: "I'm anticipating her saying that this has happened over a period of years, which has been disclosed, and sexual acts happening in

3

different locations in the home." On February 20, 2019, the court granted the State's motion *in limine*, noting that the initial recordings and interviews contained a "broad" expanse of evidence.

¶ 8      The case proceeded to trial. During the jury selection process, three potential jurors made comments in the presence of the entire venire. Potential juror C. Stinson indicated that after seeing the defendant, she did not believe that she could be impartial, and that she believed that the defendant was guilty. Potential juror J.D. Bradberry indicated that his granddaughter had been a sexual abuse victim, and that he did not believe that his family's experience would allow him to be unbiased. J.D. Bradberry did not provide further details about the abuse or about the abuser. Upon further questioning, J.D. Bradberry suggested that "a tall tree and a short rope will take care of that problem." Defense counsel did not request any admonishments regarding the comments made by C. Stinson and/or by J.D. Bradberry.

¶ 9      Ultimately, defense counsel successfully challenged 12 potential jurors for cause on the basis that these individuals either expressed explicit bias or inability to cope with the subject matter of the charged crimes. Both C. Stinson and J.D. Bradberry were removed for cause.

¶ 10     A third potential juror, A. Wesley, expressed concerns about serving on the jury because he worked evenings. In addition, A. Wesley revealed that he had three children under the age of 18, with two of the three being young girls. In response to a question from the defendant's attorney, if the defendant should be comfortable if A. Wesley was selected as a juror, A. Wesley stated that while he did not know the defendant, "I would be nervous about fathers with young girls on the jury." He concluded by stating that he would try his best to be impartial. In follow-up, he acknowledged that he may have a bit of a bias because he does have two daughters, but that he would try not to have a bias against the defendant. Defense counsel ultimately attempted to

4

challenge A. Wesley on the basis that he could be unfocused because he worked nights. The court denied that challenge. Defense counsel did not challenge A. Wesley based on bias and opted not to use an available peremptory challenge. A. Wesley served on the jury.

¶ 11    The State first called Julie Dickerson to testify. In February 2018, Dickerson worked as a guidance counselor at Nuttall Middle School. R.M. spoke to Dickerson at school and told her that her grandfather, Alfred, was "sexually abusing and raping" her. R.M. told Dickerson that Alfred's abuse included inappropriate touching and making R.M. "do things she didn't want to do."

¶ 12    The State next called R.M., the victim, to testify at the trial. R.M. stated that she was 13 years old on that date and was 12 when she informed Dickerson about the abuse. She testified that in February 2018, she was living with her younger brother, her grandmother, and her grandfather, the defendant. R.M. testified that on February 20, 2018, she spoke to Dickerson and told her that the defendant had raped her. She stated that the abuse took place on a chair in the living room several days before her February 20, 2018, conversation with Dickerson. R.M. testified that the defendant "put his penis in my vagina." She further testified that he laid a jacket over her lap which covered her up. She stated that she believed the use of the jacket was intended to prevent anyone from observing the sexual activity.

¶ 13    The State asked R.M. if the defendant had engaged in other sexually abusive behaviors. R.M. stated that the abuse started when she was six and was ongoing. R.M. testified that the first time the defendant abused her, he did so in a bedroom of the house. R.M. explained that her grandmother was usually gone to a store or to check for mail when the abuse occurred.

¶ 14    R.M. also testified about being interviewed at "a place close to the hospital." Her grandmother and her younger brother were both present during the recorded interview. R.M. said that a few people were asking her questions. After the interview, R.M. said that she went back

5

home and was accompanied by a detective and "another lady." When she got back to her home, R.M. then told the detective and the lady about the defendant's use of a jacket, and about the rooms where the abuse occurred.

¶ 15 The State then asked R.M. to explain how the defendant sexually abused her in the living room chair. R.M. testified that she would be on top of the defendant in his lap and he would then put his penis in her vagina. The defendant would call R.M. over to him, and he would either tell her to pull her pants down, or he would do so. She knew that the abuse was going to happen whenever he would call her over to him. R.M. testified that the abuse typically occurred once per week. When the defendant abused her in one of the bedrooms, he would do so on the bed or on a freezer that was stored in that room. R.M. said that with the freezer, the defendant would either put her on the freezer or have R.M. bend over on the freezer. R.M. identified a group exhibit as the defendant's jackets used during the abuse.

¶ 16 During cross-examination, R.M. acknowledged that before she met with Dickerson in February 2018, she attended a sexual abuse presentation at her school. R.M. testified that she did learn some new information during that presentation, but that much of the information she already knew because of previous presentations. R.M. stated that during her recorded interview, she did not mention the inclusion of chairs, the freezer, or jackets as being part of the abusive acts. She admitted that she initially indicated that the abuse occurred in the bedroom. R.M. testified that no one told her to use the language, "he put his penis in my vagina."

¶ 17 The State next called Jamie Wells, a Department of Children and Family Services child protection specialist. Wells testified that she spoke to Dickerson, the school employee who met with R.M. Dickerson informed Wells that R.M. was tearful and fearful about disclosing the abuse.

6

¶ 18    Wells had been present and observed an interview of R.M. conducted by an Angela Newlin. The interview recording was then played for the jury. R.M. was 12 and in the sixth grade when she was interviewed. She stated that she lived in a home with her younger brother, her grandmother, and the defendant. R.M. stated that the defendant had been touching her since she was "little" and described the locations of the touches as "down below and on my boobs." She referred to her vagina as a "vag" and to the defendant's penis as his "pee pee." She stated that the defendant made her touch him "in places" and that he touched her with his body parts. R.M.'s responses about whether the defendant had her touch his body parts was inconsistent. She denied that he made her touch him, but when asked where he made her touch him, R.M. replied that she touched his pee pee. She informed the interviewer that the acts took place in one of the two bedrooms. R.M. affirmatively shook her head when asked if the abuse occurred on a weekly basis. She said that the defendant told her that the abuse was to be kept secret. The most recent act of abuse occurred the previous weekend when R.M.'s grandmother left the home to go to the grocery store.

¶ 19    In addition to testimony about the recorded interview, Wells testified that after the interview, she and Detective Mullins traveled to the Waldrop residence where R.M. lived to gather additional evidence. While in the home, R.M. informed Wells that the defendant had "put her hands on the freezer and he put his pee pee in her vag and her butt." R.M. also identified two flannel jackets as the jackets that were put over R.M. while the defendant abused her. Wells testified that they collected these two flannel jackets as evidence.

¶ 20    The State next called David Mullins to testify. Mullins was employed as a Robinson Police Department detective and was actively involved in the investigation of this case. He testified that he watched R.M.'s recorded interview with Newlin and went with Wells to the Waldrop home

where they collected two flannel jackets. Mullins testified that when they were in the Waldrop home, R.M. disclosed that sometimes the abuse occurred while sitting in a recliner in the living room. R.M. told Mullins that the defendant would wrap the jackets around her waist so that if her younger brother came into the living room, it would appear that R.M. was sitting in the defendant's lap.

¶ 21    On cross-examination, Mullins testified that he asked R.M.'s grandmother if she had gone to the store the previous weekend, when R.M. had indicated was the last time she had been abused by the defendant. She informed Mullins that she did go to the grocery store and produced a receipt that verified this shopping trip. However, R.M.'s grandmother informed Mullins that the children accompanied her to the store.

¶ 22    Mullins testified that he did not take the comforter from the bed because R.M.'s statements about the sexual acts indicated that the acts took place on or next to the freezer and not on the bed. Mullins confirmed that R.M. provided additional information while at the home from what she provided earlier that same date during her interview.

¶ 23    The State called Dr. Rachel Winters to testify as an expert witness in the areas of medical examination and sexual assault examination. Dr. Winters examined R.M. on February 22, 2018, at the Lawrence County Memorial Hospital. She found no bruises, abrasions, lacerations, or other abnormalities in R.M.'s labia, anus, and hymen. Dr. Winters acknowledged that based upon her examination, there was no physical evidence in support of R.M.'s abuse claims. However, she noted that if a sexual assault examination is not conducted within 48 hours of the assault, 94 to 98% of these "late" examinations result in normal findings.

¶ 24    Jennifer Acosta-Talbot next testified for the State. Talbot testified that she is an Illinois State Police forensic scientist. She was qualified to testify as an expert in the field of forensic

science. Acosta-Talbot testified she examined the two flannel jackets collected from the Waldrop home and that she found six semen stains that were extracted for testing.

¶ 25 Dana Pitchford was also called to testify for the State. Pitchford testified that she is an Illinois State Police forensic scientist. She was qualified to testify as an expert in the field of forensic science. Pitchford testified that she performed DNA analysis on the six semen samples that Acosta-Talbot extracted from the flannel jackets and on the samples taken from R.M.'s sexual assault kit collected by Dr. Winters. From the semen samples, Pitchford determined that the male DNA belonged to the defendant and that there was a minor DNA profile as well, from which R.M. could not be excluded. Pitchford indicated that she only analyzed the material taken from the semen samples and did not test the entire jacket for other DNA profiles.

¶ 26 The defendant called several witnesses who testified about their relationship with him and their observations of his interactions with R.M. and her brother. First to testify was Jonathan Orr. Orr considers himself to be R.M.'s father, although he is not her biological father. The defendant is his stepfather. Orr began a relationship with R.M.'s biological mother when R.M. was five or six months old. That relationship continued for six years. Orr is the biological father of R.M.'s younger brother. He consented to the placement of his guardianship with the Waldrops when he was incarcerated. Orr testified that R.M. never indicated that she did not want to live with the Waldrops and that he personally had no concerns about R.M. living in the Waldrop home. Connie Ault, the defendant's ex-wife, testified that they had two children. She and her children and grandchildren would travel to Robinson to visit and stay with the defendant every other weekend. Ault testified that she never saw the defendant alone with R.M. Roger Brimberry testified that he had been the defendant's friend for 15 years. Brimberry testified that he never saw anything to

9

raise concerns when he visited the defendant, and he characterized him as being a good man and one whom he would trust with his life.

¶ 27    The defense next called the defendant's partner, Linda Waldrop. The Waldrops were married, divorced, and then reconciled, but did not remarry. As of the date of trial, the Waldrops had lived together for 10 years. Linda had sole guardianship of R.M. and her younger brother. Although the defendant was not the children's guardian, he helped Linda raise them. She testified that R.M. had been diagnosed with attention deficit hyperactivity disorder for which she was under the care of a psychiatrist. The Waldrops live in a two-bedroom home. The Waldrops sleep in one room, while the two children sleep in bunk beds in the second bedroom. Linda confirmed that Ault frequently came to visit with her children and grandchildren. Linda testified that when she leaves the house to go shopping, she is typically with the two children. She indicated that she could not remember any time in the week before R.M. reported the abuse that R.M. and the defendant were home alone and testified that when she went shopping and to the laundromat that week, R.M. was with her. However, on cross-examination, she acknowledged that two to three times each month, the defendant would be home alone with both children. R.M. never informed Linda that she was afraid of the defendant.

¶ 28    Linda identified the flannel jacket as one that the defendant owned. She claimed that the defendant, R.M., and R.M.'s brother had all worn the jacket. She testified that R.M. had worn the jacket "hundreds of times" and that R.M. had slept in the jacket "several hundred times."

¶ 29    At the end of the trial, the parties stipulated to the jury instructions. During deliberation, the jury asked a question involving whether DNA could be "laid down" onto the semen spot at a different time. The trial court indicated that it was not able to answer that question. Although the trial court said that it would have a response prepared for the jury, and a copy provided to counsel,

10

the record does not contain the court's response. After deliberation, the jury returned a guilty verdict.

¶ 30　　On April 11, 2019, defense counsel filed a posttrial motion alleging that the trial court committed error by allowing the admission of R.M.'s hearsay other-crimes statements. The trial court denied this motion.

¶ 31　　At sentencing, the defendant asked the trial court to grant him a new trial because there was medical evidence withheld by his attorney that demonstrated his innocence. The trial court did not ask the defendant any questions about this statement. The defendant was sentenced to 25 years of imprisonment in the Illinois Department of Corrections to be followed by a 3-year term of mandatory supervised release. The defendant timely appealed.

¶ 32　　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 33　　On appeal, the defendant claims that the trial court failed to conduct an inquiry into his *pro se* allegations of ineffective assistance of counsel. He asks this court to remand this case to the trial court so that the court can conduct a preliminary inquiry into his *pro se* allegations. The State concedes this issue. We agree.

¶ 34　　After a defendant raises a *pro se* ineffective assistance of counsel claim, the court is required to adequately inquire into the factual basis of the claim and under certain circumstances appoint new counsel to argue the claim on the defendant's behalf. *People v. Jackson*, 2020 IL 124112, ¶ 96; *People v. Krankel*, 102 Ill. 2d 181, 187-89 (1984). When a defendant advances a *pro se* posttrial allegation that his attorney provided ineffective assistance, the trial court's first step is to conduct an inquiry into the factual basis of the claim. *Jackson*, 2020 IL 124112, ¶ 97. The supreme court in *People v. Moore* set out three ways the court may conduct an adequate inquiry: (1) the court may question trial counsel regarding the facts and circumstances surrounding

11

the claim; (2) the court may briefly discuss the claim with defendant; or (3) the court may base its evaluation on its objective assessment of defense counsel's trial performance and on the sufficiency or insufficiency of the defendant's claims. *People v. Moore*, 207 Ill. 2d 68, 78-79 (2003). A defendant is not automatically entitled to the appointment of new counsel; whether the court should appoint new counsel depends upon the outcome of the court's preliminary evaluation. *Id.* at 77. If, after conducting the inquiry, the court determines that the claim lacks merit or pertains only to matters of trial strategy, the court need not appoint new counsel and may deny the *pro se* motion. *Jackson*, 2020 IL 124112, ¶ 97; *Moore*, 207 Ill. 2d at 78. If, however, the allegations show possible neglect, new counsel should be appointed to represent the defendant's claims. *Id.*

¶ 35    The purpose of holding a *Krankel* hearing is to provide the trial court with an adequate opportunity to fully consider a defendant's ineffective assistance claims. *People v. Ayers*, 2017 IL 120071, ¶ 21 (quoting *People v. Jolly*, 2014 IL 117142, ¶ 29). A *Krankel* hearing can serve to limit issues raised on appeal. *Id.* Moreover, evaluation of a defendant's claim in a *Krankel* hearing assists the trial court in creating a record for appeal. *Id.* (quoting *Jolly*, 2014 117142, ¶ 38). The supreme court further explained the basis for a preliminary inquiry as follows:

> "The purpose of the preliminary inquiry is to ascertain the underlying factual basis for the ineffective assistance claim and to afford a defendant an opportunity to explain and support his claim. In this way, the circuit court will have the necessary information to determine whether new counsel should be appointed to argue the claim of ineffective assistance of counsel. A defendant need only bring his claim to the court's attention, posttrial, whether orally or in writing." *Id.* ¶ 24.

To trigger a *Krankel* inquiry, a defendant must, at a minimum, state: "(1) he has a complaint about trial proceedings and (2) that complaint involves something his attorney did or failed to do." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 69.

¶ 36    Here, the defendant made the following statement at sentencing:

"As my lawyer said, that doctor stated there wasn't no findings but, Your Honor, I would hope you would rethink your decision on a new trial because the medical evidence was withheld from my jury and that was the primary evidence in this case. That plainly states no crime was committed between the medical report and the swabs that was taken for evidence, and both of them combined proved with more than reasonable doubt that this alleged crime did not happen and should not have been withheld from my jury that said no findings whatsoever. I'm begging the Court for a new trial. The evidence should have not been withheld by my attorney and I don't understand why it was in this case when it proved that this alleged crime did not happen. I did not get a fair and impartial trial because of these facts, Your Honor, and I deserve a new trial so I'm begging you for a new trial, Your Honor.

But if not, then I would like for my attorney to put the appeal papers in as soon as possible, Your Honor, sir.

But the medical evidence, sir, should have been presented to the jury so they would be able to see exactly what was done and no findings was found, Your Honor, it shouldn't have been withheld from my jury for me to get a fair jury, sir, fair jury trial. They should have been able to see that at deliberations, sir. Thank you."

The defendant did not file a *pro se* posttrial motion alleging that his trial counsel was ineffective. But, his statement on the record serves as his *pro se* allegation. As the supreme court stated in *People v. Bates*:

"[T]he trial court is required to inquire into counsel's effectiveness only upon a clear claim of ineffective assistance by a *pro se* defendant or by an attorney at the defendant's direction." *People v. Bates*, 2019 IL 124143, ¶ 33.

¶ 37    In this case, the State concedes this *Krankel* issue. Therefore, we remand this case to the trial court with directions for the limited purpose that the court conduct a preliminary *Krankel* inquiry into the defendant's *pro se* posttrial allegations of ineffective assistance of counsel.

¶ 38    We decline to address the defendant's remaining claims on appeal because we are remanding this case to the trial court to conduct the appropriate *Krankel* hearing. *People v. Bell*, 2018 IL App (4th) 151016, ¶ 37; *Ayres*, 2017 IL 120071, ¶ 13. The defendant's remaining claims could become moot depending upon the outcome of the preliminary *Krankel* inquiry. *Bell*, 2018 IL App (4th) 151016, ¶ 37. If the trial court determines that the defendant received ineffective

assistance of counsel, then a new trial must be ordered. *Krankel*, 102 Ill. 2d at 189. However, if the trial court concludes that counsel provided effective assistance, his conviction and sentence would stand. *Id.* If the trial court denies a new trial, the defendant will retain his right to appeal that ineffective assistance claim, as well as the other issues he raised in this appeal that we did not address. *Id.*

¶ 39                                                III. CONCLUSION

¶ 40    For the reasons stated in this order, we remand this case to the circuit court of Crawford County with directions to conduct a preliminary *Krankel* inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel.


¶ 41    Remanded with directions.